Filed 8/12/24

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FOUR

| | |
|---|---|
| In re N.J., a Person Coming Under the Juvenile Court Law. | B326007 consolidated with B331343 |
| | (Los Angeles County Super. Ct. Nos. 21CCJP03756 21CCJP03756A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>C.J.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Reversed and remanded with instructions.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Amir Pichvai for Plaintiff and Respondent.

***

## INTRODUCTION

The California Legislature has expressed a strong preference to place children who have been detained from their parents with family members whenever possible. To that end, there is a detailed statutory scheme setting forth the duties of the Los Angeles County Department of Children and Family Services (DCFS) and the juvenile court, including requiring DCFS to promptly, and diligently assess any interested family members for placement when a child is removed from parental custody. If a family member requests placement, the statutory placement preference under Welfare and Institutions Code, section 361.3[1] requires DCFS and the court to place the relative at the head of the line for placement and to place the child with the relative if practicable. DCFS and the juvenile court utterly failed to perform these duties in this case and, as a result, failed this family.

Child N. was removed from mother C.J. immediately after her birth in August 2021, due to mother's substance abuse and mental health issues. Shortly thereafter, DCFS placed her with a foster caregiver (the caregiver) who, according to DCFS, was a "trial attorney for the County Counsel's office, Dependency Division." At the same time, maternal aunt (aunt) requested assessment for N.'s placement. DCFS did not do this assessment

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

then, nor did it do so for the following year, despite repeated requests by mother's counsel, N.'s counsel, and aunt herself. Instead, DCFS repeatedly reported to the court that it was continuing to assess aunt, without further explanation; the court, in turn, repeatedly ordered DCFS to assess aunt and to report on the status, ignoring DCFS's failure to do so and the pleas by mother and others that there had been almost no visitation and no movement toward placing N. with aunt. DCFS provided no explanation for the delay, but nevertheless failed to place N. with aunt on an emergency basis during the seven months aunt was waiting for resource family approval, or during the seven months between approval of aunt's home and termination of mother's reunification services.

Meanwhile, almost no visitation occurred between N. and her family members. DCFS deferred to the caregiver and allowed her to dictate entirely when N. would visit with aunt. The caregiver limited these visits to once per month, and would not allow weekend visits because that was the caregiver's "quality time" with N. After aunt was finally approved for placement and the caregiver was provided notice that N. would be moved, DCFS deferred to the caregiver's objection and did not move the child. Ultimately, by the time DCFS and the court "considered" aunt for placement, over a year had passed since N. was placed with the caregiver. Although the record indicates that aunt took full advantage of the visitation she was given, the unexplained and unreasonable limitations on visitation imposed by the caregiver and sanctioned by DCFS and the court left her without a meaningful opportunity to establish a deep bond with N. As a result, at the section 361.3 hearing in December 2022 (one year and four months after aunt first requested placement), the court

3

found it was too late to apply the relative placement preference. The court further found that even if it applied the preference, it was not in N.'s best interest to move her due to her bond with the caregiver and the passage of time.

In this consolidated appeal, mother challenges the court's order denying her request to place N. with aunt and the order terminating her parental rights. She also argues that DCFS and the court failed to properly serve aunt, mother's appointed conservator, with notice of all dependency proceedings, failed to appoint either a guardian ad litem or aunt to speak for mother, and failed to advise aunt and mother of mother's right to file a writ after the court terminated mother's reunification services. We conclude that DCFS's inexplicable delays in fairly evaluating aunt for placement and the lackluster response by DCFS and the court to the pleas by mother, aunt, and N. (through counsel) to provide supportive services to this family compels reversal. The lengthy fallout of these failures is particularly egregious—the longer DCFS and the court delayed in properly assessing aunt for placement, the more N. became bonded to the caregiver and the more disruptive any replacement would be for a young child who had experienced disruption and trauma since her birth. Under the circumstances here, DCFS cannot shut a family almost completely out of the process for over a year and then point to the passage of time and failure to form a bond as the reasons for denial of placement.

We therefore conclude that the juvenile court erred by failing to apply the relative placement preference under section 361.3, and that the error was prejudicial. We find that the failures in providing proper notice to aunt and in providing reasonable services to mother require reversal as well. We

4

reverse the order terminating mother's reunification services, the order denying mother's section 361.3 motion, and the order terminating her parental rights and remand for further proceedings. On remand, we also direct DCFS and the court to ensure compliance with the inquiry and notice requirements of the Indian Child Welfare Act (25 U.S.C. § 1901, et seq.) (ICWA).

## BACKGROUND

### I.    *Petition*

N. was born on August 9, 2021 and is mother's only child. According to the DCFS detention report, mother was admitted to the hospital several days before N.'s birth and placed on a psychiatric hold as a danger to herself or others. She was violent toward hospital staff and "acutely psychotic." Mother tested positive for methamphetamines at the hospital. N. tested negative for drugs at birth. Mother told DCFS that she did not know the identity of N.'s father.[2]

The court ordered N.'s detention on August 10, 2021. The same day, aunt called the DCFS children's social worker (CSW) asking to be considered for placement. She told CSW that she was available for a home assessment after 4:30 pm. No assessment was done at this time. Maternal grandmother (MGM) also asked to be considered and told DCFS that she and aunt planned to be caregivers together as they both worked. However, DCFS stated that MGM's possible criminal history precluded her from emergency placement. N. was placed with the caregiver, who DCFS reported was a "trial attorney for the County Counsel's office, Dependency Division." N. remained with the caregiver throughout the proceedings.

---

[2]    Father, M.R., is not a party to this appeal.

DCFS filed a dependency petition on August 16, 2021 on behalf of newborn N. under section 300, subdivision (b)(1).[3] The petition alleged that N. was at risk of harm due to mother's mental health problems and drug abuse, including her use of drugs while pregnant with N. The petition further alleged that mother had attempted suicide, was involuntarily hospitalized in July and August 2021, and was diagnosed with schizophrenia and "amphetamine induced psychotic disorder." The August 16, 2021 detention report listed aunt as a relative to consider for placement.

At the August 17 detention hearing, N.'s counsel asked DCFS to assess all relatives for placement, including MGM and aunt. The court ordered N. detained from mother and gave DCFS discretion to place the child with any appropriate relative. The court ordered DCFS to "continue to assess family members for placement." The court also ordered family reunification services for mother, including visitation for a minimum of nine hours per week with a written visitation schedule. Mother had been accepted into a substance abuse program after she was discharged from the hospital. The court further ordered DCFS to assess whether mother's facility would allow N. to live with her and provide that information in the next report.

---

[3]     Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court. . . . [¶] (b)(1)  The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of … (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child."

6

## II.  *Adjudication and disposition*

DCFS filed its jurisdiction/disposition report on September 29, 2021, reporting that mother remained in a mental health facility with the goal of becoming sober and reunifying with N. DCFS spoke with mother at the facility, but reported that she had not "contacted the Department or caregiver in order to initiate visits" with N.  Father contacted DCFS and requested a paternity test.  DCFS reported that MGM could not be considered for placement due to her criminal history, but did not include any information regarding aunt.  Mother filed a relative information sheet on September 29 listing aunt as a potential caregiver and providing her address.

At the next hearing on September 30, 2021, mother remained in an inpatient facility but appeared by phone. Mother's counsel and N.'s counsel both requested that DCFS assess aunt for placement.  The court ordered aunt's assessment and again gave DCFS discretion to place N. with any appropriate relative.  The court again ordered visitation for mother if allowed by her facility, and for DCFS to facilitate those visits, if not in person, then at least by video.  There was no information in the record at this point that any visitation had occurred.

On October 12, DCFS reported in a last-minute information that aunt was "currently in the process of being assessed by RFA [resource family approval] as possible placement."  On October 14, mother submitted to the jurisdictional allegations.  The court sustained the allegations, found jurisdiction over N., and continued disposition.  Mother's counsel requested a referral to a dual diagnosis program for mother; the court ordered DCFS to assess whether such a program would be appropriate.  At

mother's counsel's request, the court also ordered DCFS to provide an update on the placement with aunt in the next report.

In November 2021, DCFS filed a first amended petition, which it ultimately dismissed and refiled as a subsequent petition under section 342. This petition added allegations that father knew of mother's substance abuse and failed to protect N. That month, DCFS reported that placement with aunt "is pending. The Department is in the process of obtaining LiveScan results for maternal uncle who resides in the home." Mother's psychiatric social worker told DCFS that mother would be assessed to be placed in a dual diagnosis facility. The social worker also reported that aunt was appointed as conservator for mother.

On December 1, 2021, the court set disposition for February 24, 2022. The court also found father was N.'s biological father. There was no update as to placement with aunt.

DCFS reported on February 10, 2022 that mother was participating in an inpatient treatment program and was waiting for placement in a long-term care and treatment facility. The last-minute information provided no updates as to aunt or visitation by mother or aunt.

At the disposition hearing on February 24, 2022, the court sustained the section 342 petition as alleged as to father. Regarding disposition on both petitions, counsel for mother requested that DCFS actively assist mother with enrollment in an inpatient or dual diagnosis program. The court found by clear and convincing evidence that it was reasonable and necessary to remove N. from parents. The court ordered mother to complete a full drug and alcohol program with weekly random testing and ordered DCFS to explore possible dual diagnosis programs. The

court also continued to order nine hours per week of monitored visitation for mother as permitted by her facility, with DCFS to provide a written visitation schedule to mother within four court days. DCFS's reports up to this point contain no indication that mother had received any visitation with N., either in person or virtual.

With respect to aunt, mother's counsel again asked the court for N. to be placed with aunt, noting, "I understand that the department isn't really looking into her for placement. She is requesting that relatives' preference placement should be [*sic*] at this time." She noted that mother had made this request "throughout the case" and that aunt was currently being assessed as a possible placement, with a possible issue being maternal uncle who lived in the same home. Mother's counsel requested "more information in regards to the department's efforts and placement with maternal aunt." For a third time in six months, the court ordered DCFS to continue to assess relatives, including aunt, for placement and to update the court at the next hearing. Mother's counsel asked the court to set a progress hearing regarding relative placement. The court denied that request but ordered DCFS to "continue to make efforts to place the child with a relative and to give the court an update."

### III. *Period of Review*

Aunt's home received resource family approval in March 2022. As recounted by DCFS in a later report, on March 29, 2022, the CSW called the caregiver to inform her that DCFS intended to serve a 14-day notice to place N. with aunt. Caregiver "expressed concerns regarding maternal aunt's protective capacity to ensure the mother would not have access to the child." The CSW explained that DCFS had reviewed with

9

aunt the terms and conditions of mother's visitation plan for her monitored visits with N. Caregiver stated that "she would take the full 14 days and would be appealing." On April 1, aunt told DCFS that she had a caretaker action plan, including someone to take care of N. while aunt was at work, and a "circle" of support. aunt "expressed concerns" to the CSW that the caregiver "has developed a strong bond with the minor, and is not in agreement with having N[.] be placed under her care. [Aunt] raised these concerns once the caregiver expressed her plan to file a grievance to prevent a placement change."

It does not appear from the record that DCFS ever issued the 14-day notice or took any further steps in April toward placing N. with aunt.

On May 17, 2022, the foster agency, DCFS, the caregiver, and aunt participated in a child and family team (CFT) meeting to discuss "the possibility" of having N. placed with aunt now that her home was resource family approved. As later reported by DCFS, "[o]ne of the areas discussed is [aunt] not having consistent or sufficient face-to-face visits with the minor due to her work schedule. The Department, the caregiver, and the maternal aunt attempted to develop a consistent visitation schedule; however, due to scheduling conflicts, a visitation agreement could not be reached. Another matter discussed was that minor had developed a very strong bond with the current caregiver, and thus, a concern was raised as to whether it would be in the minor's best interest to remove her from the current caregiver. It was recommended[4] a bonding study be ordered prior

---

[4] The report does not specify who made this recommendation.

to any changes in placement to ensure minor's best interest are [*sic*] prioritized when making any placement recommendations."

DCFS filed a status review report on August 10, 2022, reporting that N. was doing well with the caregiver who was a "strong advocate of the child's needs." DCFS also reported that the caregiver "has also facilitated visits for the mother by monitoring mother's visit [*sic*] with the minor via zoom and as well for the maternal aunt . . . in-person. [The caregiver] wants to ensure the child remains connected with the family in order to establish a good social-emotional relationship." Mother was currently in an inpatient behavioral health center and the CSW was coordinating with her social worker to "resume virtual visits" with N. once per week.

The caregiver reported that N. was scheduled for an intake assessment at the regional center. She was not receiving mental health services at that time. Regarding visitation, the caregiver reported that mother had virtual visits through zoom, lasting 15 to 20 minutes. The caregiver stated that mother was appropriate during visits. The caregiver also stated that she was only available to facilitate virtual visits with mother from 1 to 2 p.m. As for aunt, the caregiver reported that she monitored in-person visits with aunt and MGM once per month. Aunt was appropriate, loving, and attentive toward N. during visits. The caregiver told DCFS that it would be detrimental to remove N. from her home.

DCFS concluded that N. would be at high risk of harm if returned to mother and recommended that N. remain with the caregiver or aunt. DCFS reported that "[d]espite the caregiver[ ] working remotely from home the maternal aunt is receiving 1x visit with the minor a month," due to the conflicting work

schedules of aunt and the caregiver. DCFS noted that although aunt's "home has been RFA approved, the minor remains placed with the current caregiver. At this time, the minor appears to have a very strong bond with the caregiver. The Department is concerned the caregiver and maternal aunt's conflicting schedule is not conducive to the minor having consistent visits with the aunt, thus not allowing her to develop a bond and healthy social emotional attachment with her. If a bonding study is recommended, the Department recommends that maternal aunt's home be considered as placement for the minor if it is deemed in the minor's best interest."

At the next status hearing on September 1, 2022, N.'s counsel asked to set the matter for contest because DCFS's report did not have a formal recommendation regarding whether to order additional reunification services for either parent. The court stated it would continue the matter to allow DCFS to clarify its recommendations. The court also noted that aunt had been approved and asked for input from counsel about placement. N.'s counsel requested a formal assessment from DCFS in the next report, stating "I don't believe that this report gives enough information regarding the maternal aunt, and I'm also requesting a bonding study between [N.] and the current caregiver." The court stated that N.'s counsel's office would have to pay for the bonding study. Mother's counsel stated that she thought there was a bonding study already done but it was not attached to the last report. The court also gave DCFS discretion to allow aunt unmonitored visits with N.

In a September 29, 2022 last-minute information, DCFS reported on mother's progress at the behavioral health center, where mother had recently moved. DCFS also reported that it

spoke with the caregiver regarding the bonding study, but the caregiver stated "she did not feel a need to move forward with a bonding study . . . as she feels it obvious [sic] the minor has established a strong bond and has well-adjusted in her home and care." The caregiver also stated that recently N. had been through "several invasive medical appointments and [she] believes adding another psychologist appointment will overwhelm" N. N. was a client of the regional center and was receiving services once a week. The caregiver also stated that N. "has been identified as at high risk for mental illness" by her pediatrician "as it runs in [N.'s] family, therefore providing a current stable and stimulating environments [sic] is in the best interest for the minor as any changes could cause the minor trauma." According to the caregiver, mother had not seen N. in person since N. was discharged from the hospital after she was born. The caregiver stated that N. had referred to her as "mom" since N. was 11 months old (approximately two months prior).

The CSW spoke with aunt regarding "establishing a consistent visitation plan." Aunt stated that she worked in the afternoons and understood that the caregiver worked in the morning. Aunt stated she was available for visits on weekends and wanted to have visits more frequently than once per month. Aunt reported that "she frequently communicates with the caregiver to inquire a best day and time to meet with the minor over the weekend, yet she is regularly informed that the caregiver have [sic] already established planned weekends between her and the minor only." The CSW also spoke with the caregiver, who stated she believed once per month visitation "is feasible at this time." The caregiver stated "she makes every effort for the minor to connect" with relatives, including aunt, but

"also recognizes that she and the minor need 'down time' from her work week schedule.  The caregiver expressed she has in place a planned schedule for her and the minor on the weekends which allows them to spend quality time together."  The caregiver agreed "to discuss further" having a consistent visitation plan for aunt to "be in place moving forward in the next month."  In the last-minute information, DCFS recommended that reunification services for mother be terminated and that N. remain placed with the caregiver, noting that although aunt was resource family approved, N. "appears to have a very strong bond with the caregiver."

In October 2022, the caregiver filed a caregiver information form, attaching a letter in which she stated that N. was "deeply bonded" to her, had called her "mom" and "mama" since she was 11 months old, and "shows a strong preference for me over all others."  She stated that a social worker approached her in May 2022 about doing a bonding study to assist DCFS in assessing N.'s best interest, but the idea was "only briefly discussed."  She stated that she "really wanted the bonding study in May," but did not believe it was necessary now that N. was 14 months old and "undoubtedly even more deeply bonded to me . . . and no reasonable psychologist would be likely to conclude otherwise."

At the review hearing on October 7, 2022, mother's counsel told the court that mother was not in attendance but "her conservator, maternal aunt" was present.  Summarizing DCFS's position, the court stated that DCFS was recommending terminating reunification services for mother because mother had not addressed her substance abuse and mental health issues. The court also noted that aunt was mother's conservator and had been resource family approved for placement, but that DCFS had

14

reported on N.'s strong bond with the caregiver. N.'s counsel stated that mother had not shown any progress in her case plan. She argued that it would not be in N.'s best interest to give mother additional services. Mother's counsel asked for more time to allow mother to stabilize, stating that mother was in a facility getting psychiatric help, but there had been difficulty getting her into a dual enrollment program.

Mother's counsel also requested a section 361.3 hearing to apply the relative placement preference, noting that the court ordered aunt to have unmonitored visits with N. at the last hearing, but aunt "still has not been getting those visits. The caregiver also does not want to make time for visits on the weekends because she said that . . . she's busy having bonding time with N. Under 361.3, the preference is supposed to be to relatives, your honor. The aunt has been approved since last March." Mother's counsel also noted that no bonding study was ever done, and that "the caregiver is now refusing to do the bonding study." She further reported that mother "has been trying to have her virtual visits, but the caregiver also does not show up at the link where the virtual visits are supposed to take place. So I think the caregiver has been dragging her feet as far as getting visits to both the mother and [aunt]. So I would ask that a 361.3 hearing be ordered, and that maternal aunt's unmonitored visits begin immediately."

Counsel for DCFS stated that the caregiver "is saying that she does not see a need for a bonding study at this juncture." As for visits, DCFS counsel noted that there had been "a conflict as to scheduling," and that DCFS "will continue to work with the family," but that it "requires flexibility on everyone's side." The court questioned whether the family was "entitled by law to a

15

361.3 hearing" and noted that in the last report DCFS had stated that aunt was approved but that DCFS believed it was "in this child's best interest to remain with her current caregiver, given their strong bond and the length of time the child has been with the current caregiver." However, the court concluded that it would set the matter for a section 361.3 hearing "in an abundance of caution." The court asked N.'s counsel to weigh in, and counsel noted that aunt was not RFA approved until N. was six months old, at which time she had "created a very strong bond to her current caretaker," and that aunt had not been given consistent visitation. The court ordered DCFS to work with aunt and the caregiver in coordinating a written visitation schedule for unmonitored visits with aunt, to be provided to aunt within one week.

The court found that the required notice had been given, that continued jurisdiction was necessary, and that mother's progress with her case plan had not been substantial. The court found by clear and convincing evidence that DCFS "provided or offered reasonable services that were designed to aid the parents to overcome the problems that led to the initial removal and continued custody of the child." The court terminated mother's reunification services and set the matter for a section 366.26 hearing.

IV.    *Section 361.3 Hearing*

DCFS filed a report on November 3, 2022 for the section 361.3 hearing. Aunt told DCFS that she wanted to provide N. with permanency through adoption and would ensure that N.'s needs were met. DCFS reported that aunt's home was safe and she had a childcare plan in place. Aunt began unmonitored visits on October 9, 2022, with a visitation plan providing for two-hour

16

visits, twice per month. Despite never mentioning any concerns before, DCFS reported that it "remains concerned" with aunt's "mental health issues" because she had depression and anxiety and saw a therapist in 2013. Aunt stated that she takes medication and manages her mental health. Aunt also reported that she sought therapy for her daughter after the daughter experienced social anxiety and was bullied. DCFS concluded that it was in N.'s best interest to remain with the caregiver and that it would be detrimental to N. to be removed from the caregiver and placed with aunt.

On November 7, 2022, the caregiver filed a de facto parent request. She attached a letter from a regional center provider which had been providing developmental services to N. once per week since July 29, 2022. The provider reported that N. had made good progress in her development and demonstrated good social-emotional skills.

DCFS filed a brief recommending that N. remain placed with the caregiver. DCFS noted that mother "continues to be under LPS conservatorship." In the brief, DCFS focused on the caregiver and her relationship with N.; it provided no additional information regarding aunt. DCFS also attached a new caregiver information form, with a new statement by the caregiver. The caregiver stated that at the May 2022 CFT meeting, "DCFS gave Aunt every benefit of the doubt," but some of the foster agency social workers "brought up some of their ongoing concerns about Aunt's ability if the case closed to protect from Mother." According to the caregiver, DCFS then told her several weeks later that "they [*sic*] decided not to move N[.] as they were not sure it was" in her best interest. At the time, the caregiver stated that N. was "suffering from separation anxiety and fear of

17

strangers" and that N.'s mental health was in question. She also stated that she was "all for" the bonding study when it was proposed by a foster agency social worker during the CFT, but DCFS "felt very strongly there was no point to such a study," and that "there was no question for them N[.] was bonded to me." The caregiver stated that she was "surprised" when DCFS brought up the bonding study "many months later," but said "if the judge ordered it that would be fine, I was just getting worried N[.] had now been put through a lot over the past year." She also attached a letter from the owner of N.'s preschool, opining that separating N. from the caregiver would be "damaging to her mental health" and could further set back her developmental milestones. The caregiver attached a letter from N.'s pediatrician with similar statements.

Both aunt and the caregiver attended the section 361.3 hearing on November 16, 2022. Counsel for DCFS argued that placing N. with aunt at that point was not in N.'s best interests. N.'s counsel stated that N. should be placed with aunt in accordance with the relative placement preference and because there was nothing in the record to indicate why aunt "could not have safe placement of my client. She's been RFA approved since March. It's unclear why there wasn't even a movement prior to today." She noted that aunt continued to have monitored visits for seven months after she was approved in March, but DCFS's reports did not "indicate the reason why they were monitored, given that the maternal aunt was already RFA-approved." N.'s counsel also noted that aunt had "called in to every hearing since detention on August 17[, 2021]. She's made it clear that she's wanted placement" of N. and "at every substantive hearing, she has requested to be assessed for placement."

Mother's counsel agreed with N.'s counsel, arguing that DCFS "does not get to break the rules throughout and then come back and say that it's too late to have placement with the maternal aunt." She noted that the "department never gave a reason why N[.] was not placed" with aunt after RFA approval, even though aunt "checks off all of the requirements. She has a safe home. She is willing to provide permanent placement for N[.]. Everything that she has been asked to do, she has qualified to do." The court continued the hearing to December. The court also asked about the caregiver's de facto parent motion, then set for hearing on February 3. The caregiver asked the court if it could be heard in December so that she could "weigh in on the 361.3 hearing." The court denied that request.

At the continued hearing on December 1, 2022, the caregiver appeared with counsel, who noted the "request for de facto status on file." The court agreed to proceed with hearing the de facto motion. The court found that the caregiver had been caring for N. since she was two days old, had been meeting N.'s "medical, educational, psychological needs on a daily basis and going above and beyond what is required. The child seems well bonded to the caregiver, and the caregiver is aware of the child's special needs and is accessing all the needed services from regional center and other providers." The court therefore granted de facto parent status to the caregiver.

Turning to the section 361.3 hearing, DCFS argued that it would be in N.'s best interest to remain in the caregiver's home. The parties and the court discussed whether the relative placement preference applied post-disposition. The court agreed with DCFS that the preference did not apply and also stated that "even if I could exercise my discretion, is it in the best interest of

19

this child at this point when the child is extremely bonded to the caregiver . . . and the child seems to be thriving in her care." The court stated that it "wasn't like [DCFS] just delayed, delayed, delayed" in terms of completing the assessment for aunt. The court also cited the opinion by the pediatrician opposed to moving N.

N.'s counsel argued that it was in N.'s best interest to place her with aunt, noting that aunt could address any anxiety issues N. might experience because aunt "had been the conservator for mother and has addressed her mental health issues. Not only that, but [aunt's] daughter N[.]'s cousin has shown she's had some social anxiety, and [aunt] has adequately cared for her daughter . . . with those issues." N.'s counsel also noted again that aunt had been approved for placement since March but was not given unmonitored visits until October, "without any kind of reason by the department. This was all preventing [aunt] from having placement or greater bond" with N. Mother's counsel agreed, arguing that DCFS was "slow walking the whole thing" and that aunt was "more than capable of taking care of her niece . . . and she has been trying to get placement from the very beginning of the case." The caregiver's counsel argued that the relative preference no longer applied, that DCFS did not fail to timely assess aunt, and that it would not be in N.'s best interest to move her.

The court found that the relative placement preference did not apply, because the case "does not fall into one of the designated categories under which the preference would apply after disposition." The court stated that even if it exercised its discretion, it "does not find it would be in this child's best interest to be placed with the maternal aunt," given N.'s strong bond with

20

the caregiver and N.'s "special psychological and emotional needs." The court therefore denied the motion under section 361.3.

## V.  *Termination of Parental Rights*

On April 6, 2023, the court ordered adoption as the permanent plan. The court held the section 366.26 hearing on August 9, 2023. Mother was present and objected to termination of her parental rights, stating that she believed it was in N.'s best interest to be placed with her or a member of her family. The court terminated the parental rights of mother and father and designated the caregiver as the prospective adoptive parent.

Mother timely appealed from the December 2022 order denying placement pursuant to section 361.3 and the August 2023 order terminating her parental rights. We consolidated the appeals for the purposes of briefing and decision.

## VI.  *ICWA Proceedings*

Mother submitted an ICWA-020 Parental Notification of Indian Status form on September 29, 2021. She stated that maternal great-grandfather said he "may be partially Native American." No additional information was provided. Father submitted a form indicating no Native American ancestry.

At the September 30, 2021 hearing, the court found that ICWA did not apply as to father. The court asked mother for further information regarding her report of possible Native American ancestry. Mother identified Debra D., a prior partner of maternal grandfather, as someone who might have further information. Counsel for DCFS suggested that DCFS could inquire of aunt if she had any further information. The court agreed and deferred an ICWA finding as to mother.

21

DCFS contacted aunt, who confirmed that there was Native American ancestry in the family, but she did not know which tribe. Aunt then spoke to Debra D. and reported to DCFS that Debra D. did not have further information but offered to contact paternal great-aunt to inquire further. Aunt contacted DCFS a few days later and relayed that according to paternal great-aunt, a maternal great-grandfather had Native American ancestry through the Ute Colorado tribe. DCFS mailed ICWA notices on October 5, 2021 to Sioux and Ute tribes, listing names for mother and MGM, and well as maternal great-grandfather's name, but placed in the section for maternal great-grandmother. No information was provided for father.

In November 2021, DCFS reported receipt of ICWA responses from several tribes, indicating that N. was ineligible for enrollment. At the disposition hearing in February 2022, DCFS reported to the court that it had provided notices to the Sioux and Ute tribes and had received responses that N. was not eligible or had received no response. The court found that there was no reason to know ICWA applied.

On October 7, 2022, the court asked aunt about possible Native American heritage. She responded that she was told by Debra D. that the family was part of the Ute tribe in Colorado. Aunt stated that Debra D. was now deceased, but she identified a maternal great-aunt named Lisa who might have additional information. Aunt provided Lisa's phone number. Counsel for DCFS also noted that it had previously noticed the Ute Mountain tribe and the Southern Ute tribe and had been notified that N. was not a member. The court found that notice had been provided and ICWA did not apply.

On February 2, 2023, counsel for DCFS informed the court that it had become aware of deficiencies in the ICWA report and was looking into them. Maternal grandmother responded to the CSW's inquiry and stated that a maternal great-grandfather, Aurelio, had mentioned being a part of the Mescalero Apache Indian tribe but had never registered. Aurelio was deceased. Maternal grandmother agreed to call the CSW back with Aurelio's date of birth and date of death. In March 2023, DCFS mailed out ICWA notices to Apache and related tribes. DCFS received several response letters indicating that N. was not eligible.

In May 2023, maternal grandmother told DCFS that she would not provide any further information because they were not getting custody of N. and it was "very upsetting" for her. Aunt also stopped responding to DCFS inquiries regarding ICWA. In June 2023, the court found that ICWA did not apply.

## DISCUSSION

Mother raises two notice issues in this appeal. Her first argument is that the court failed to provide proper notice of proceedings to aunt, who was mother's conservator. Mother also contends she did not receive proper notice of the necessity to seek writ review to preserve a challenge to the court's order terminating reunification services. We conclude that the court erred in both respects. The court's failure to provide notice to mother and its inattention to her incapacity were also prejudicial, requiring reversal of the termination of reunification services and parental rights. Substantively, mother argues that the court erred in denying her request for relative preference pursuant to section 361.3. We agree that the juvenile court erred and that the error was prejudicial. Finally, mother contends that DCFS

23

failed to properly conduct its inquiry under ICWA. We direct DCFS and the court to address any ICWA deficiencies on remand.

## I.    *Notice to Conservator*

Mother contends that DCFS failed to serve notice of all proceedings on aunt, as mother's appointed conservator, and that the court failed in its duty to appoint a guardian ad litem (GAL) for mother or to order her conservator to appear on mother's behalf. She asserts that these errors require reversal of the order terminating her parental rights.

Mother argues that DCFS and the juvenile court knew that aunt had been appointed as her conservator at least as of November 2021, and that the corresponding duty to involve aunt in the dependency proceedings flowed from that point onward. DCFS counters that apart from a few "scattered unsupported verbal representations," the record does not contain evidence of mother's conservatorship or whether DCFS or the court was advised of it. What DCFS ignores, however, is that several of the references in the record to mother's conservatorship come from DCFS and the court. In November 2021, DCFS reported that it had been informed by mother's social worker that aunt was appointed as conservator for mother. Then, at a hearing in October 2022, N.'s counsel stated that aunt was present as mother's conservator, a fact later echoed by the court. A month later, DCFS reported that mother "continues to be under LPS conservatorship."[5] As such, DCFS and the juvenile court both

---

[5]    This refers to a conservatorship of a person under the Lanterman-Petris-Short (LPS) Act. (§ 5000 et seq.) "The LPS Act governs the involuntary detention, evaluation, and treatment of

24

acknowledged throughout the dependency proceedings that aunt was acting as mother's conservator. DCFS cannot reverse course on appeal and claim that it was unaware of aunt's appointment.

Given aunt's status as conservator, mother contends that DCFS was required to serve aunt with notices of all dependency proceedings but failed to do so. Specifically, mother asserts that aunt was not notified of the disposition in February 2022, several review hearings in June 2023, or the section 366.26 hearing in August 2023. We agree that service on aunt as mother's conservator was required. In *In re Daniel S.* (2004) 115 Cal.App.4th 903, 911 (*Daniel S.*), the court looked to Code of Civil Procedure section 416.70, which provides that service of a summons on a conservatee may be made by delivering a copy to the conservator. The court concluded that DCFS was excused from serving notice on the mother, as her significant mental illness rendered her incapable of comprehending it, but that DCFS was required to provide notice of the proceedings to the mother's conservator. (*Id*. at pp. 911-912.) DCFS does not dispute that it did not serve all notices on aunt. That was error.

Mother also complains that the juvenile court was required to appoint a GAL or order aunt to appear on behalf of mother as

persons who, as a result of mental disorder, are dangerous or gravely disabled. (§ 5150 et seq.) The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement. (§ 5350.1.) As defined by the Act, a person is 'gravely disabled' if, as a result of a mental disorder, the person 'is unable to provide for his or her basic personal needs for food, clothing, or shelter.' (§ 5008, subd. (h)(1)(A).)" (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142.)

her conservator. "In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court." (*In re James F.* (2008) 42 Cal.4th 901, 910, citing Code Civ. Proc., § 372.) "[W]hen a dependency court is informed that a conservator has been appointed for a party, the dependency court also has a sua sponte obligation either to appoint a GAL for that party or to order that the party shall appear through his or her conservator." (*In re A.C.* (2008) 166 Cal.App.4th 146, 155.) "The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem. . . ." (*In re James F., supra*, 42 Cal.4th at p. 910.) The juvenile court's failure here to either appoint a GAL or order mother to appear through her conservator was error.

We further conclude that these errors, particularly in combination, were not harmless. Regarding the failure to provide notice of the proceedings, we determine whether the error is harmless beyond a reasonable doubt. (See *Daniel S., supra*, 115 Cal.App.4th at p. 913.) On the other hand, the court's failure to appoint a GAL or order aunt to appear on mother's behalf is reviewed under the harmless error standard. (See *In re A.C., supra*, at p. 157 ["The failure to appoint a GAL or to compel a person's guardian to appear is not jurisdictional, but 'merely irregular.'"].) For the latter, "[w]e do not set aside the judgment unless a different result would have been probable had the error not occurred." (*Ibid.*, citing *In re Lisa M.* (1986) 177 Cal.App.3d 915, 920, fn. 4.)

The errors here were prejudicial to mother under either standard. DCFS and the court knew that mother was repeatedly and extensively hospitalized for mental illness and that she

lacked capacity to the extent that aunt was appointed as her conservator. But the court failed to order aunt to appear in the dependency proceedings on mother's behalf. While aunt was present at many of the proceedings, she was not advised that she could speak for mother. Similarly, although aunt received some of the notices of proceedings that were sent to her address for mother, they were not addressed to aunt as mother's conservator. Without knowing she had the ability to appear on mother's behalf, aunt had no opportunity to voice the family's concerns regarding the numerous failures by DCFS and the court, including the lack of visitation given to either mother or aunt and the delays in assessing aunt for placement of N. Although some of these issues were raised by mother's and N.'s counsel, aunt could have provided further information as to the severity of the issues (information that DCFS should have provided in its reports but did not) and could have urged the court to act. Certainly, with proper notice, aunt could have been present on mother's behalf for key hearings such as the disposition and section 366.26 hearings. As such, these errors were prejudicial and require the reversal of the order terminating mother's parental rights.

## II.    *Writ Notice*

Mother next seeks to challenge the court's October 7, 2022 order terminating her reunification services and setting the matter for a section 366.26 hearing. She contends that the court erred in finding that DCFS provided reasonable services to her during the reunification period. However, an order terminating reunification services and setting a section 366.26 hearing is not appealable unless "[a] petition for extraordinary writ review was filed in a timely manner." (§ 366.26, subd. (l)(1); see also *In re*

*X.Z.* (2013) 221 Cal.App.4th 1243, 1248–1249.) "The failure to take a writ from a nonappealable dispositional order forfeits any challenge to that order, except if the juvenile court fails to advise a parent of the writ petition requirement. In that case, the parent generally has good cause to be relieved of the requirement." (*In re J.R.* (2019) 42 Cal.App.5th 513, 525, citing *In re Athena P.* (2002) 103 Cal.App.4th 617, 625.) Mother did not seek writ review of the October 2022 order. She contends her claim is not barred because the juvenile court failed to provide her with proper notice of the writ requirement. We agree.

When a juvenile court orders a hearing pursuant to section 366.26, it is obligated to advise the parties of the writ requirement. (§ 366.26, subd. (l)(3)(A); Cal. Rules of Court, rule 5.590, subd. (b).) If a party is present at the hearing at which the section 366.26 hearing is set, the court must orally advise the party of the writ requirement; if the party is not present, the writ advisement must be mailed by first-class mail to that person's last known address. (§ 366.26, subd. (l)(3)(A); *In re A.A.* (2016) 243 Cal.App.4th 1220, 1239-1240; rule 5.590(b)(2).) When assessing compliance with the written advisement requirement, we look to whether the juvenile court sent notice "to an address where [the party] would likely receive it." (*In re A.A.*, at p. 1240.)

Mother was not present at the October 7, 2022 hearing, but aunt was. Moreover, mother's counsel expressly informed the court that aunt was present as mother's appointed conservator. As we previously discussed, the court was therefore required to provide aunt with the oral writ advisement on mother's behalf. The court's failure to do so was error. (§ 366.26, subd. (l)(3)(A).)

The written writ advisement was also insufficient. The court clerk mailed the writ notification to mother at the mailing

28

address mother listed on her "Notification of Mailing Address" form (Judicial Council form JV-140). This address was also aunt's home address. However, in September 2021, mother told DCFS that she was in an inpatient mental health facility and requested that DCFS send her notices to the facility. The DCFS dependency investigator agreed to send mother's notices as requested. DCFS subsequently reported in September 2022 that mother had been admitted to a different facility and provided the court with the facility's address. As such, to the extent the court was required to serve mother directly, her "last known address" was the health facility where she was residing at the time of the October 2022 hearing. In addition, as previously discussed, the court was required to serve aunt as mother's conservator with all notices of the proceeding. It is undisputed that it did not serve aunt with a written writ advisement.

As a result of the failure to advise mother and aunt of the writ requirement, mother has good cause to excuse her failure to timely seek an extraordinary writ regarding the termination of her reunification services. We therefore reach the merits of mother's arguments on that issue.

Mother contends that the order terminating her reunification services must be reversed because the juvenile court failed to make the proper finding by clear and convincing evidence and DCFS failed to provide her with reasonable services prior to termination.

"A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. 'When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court

29

must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact.'" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*); see also *Serena M. v. Superior Court of Fresno County* (2020) 52 Cal.App.5th 659, 674; *In re Monica C.* (1995) 31 Cal.App.4th 296, 306.) "When applying the substantial evidence test, however, we bear in mind the heightened burden of proof. [Citation.] 'Under this burden of proof, "evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." [Citation.]'" (*Alvin R., supra*, 108 Cal.App.4th at p. 971, quoting *In re Monica C., supra*, 31 Cal.App.4th at p. 306.)

Here, when terminating reunification services, the court found by clear and convincing evidence that DCFS "provided or offered reasonable services that were designed to aid the parents to overcome the problems that led to the initial removal and continued custody of the child." The court further found that mother's compliance with the case plan was not substantial and mother's visits had been "inconsistent." We cannot conclude that substantial evidence supports the finding that the services provided by DCFS were reasonable.

Services are reasonable if the Department has "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult." (*Alvin R., supra*, 108 Cal.App.4th at pp. 972-973, quoting *In re Riva M.* (1991) 235 Cal.App.3d 403, 414, italics omitted.) "Visitation is an essential component of any

reunification plan." (*Alvin R., supra*, 108 Cal.App.4th at p. 972, citing *In re Mark L.* (2001) 94 Cal.App.4th 573, 580.) "To promote reunification, visitation must be as frequent as possible." (*Alvin R., supra*, 108 Cal.App.4th at p. 972, citing *In re Luke L.* (1996) 44 Cal.App.4th 670, 679.)

DCFS failed to provide mother with reasonable services to support her visitation with N. At the August 2021 detention hearing, the court ordered a minimum of nine hours visitation per week for mother and a written visitation schedule. DCFS did not provide a written visitation schedule to mother until after it was again ordered to do so in February 2022, six months later. Worse still, DCFS provided no information about any visits between mother and N. for the first *year* of dependency proceedings. The record does not make clear how many virtual visits mother had, but it appears to be only a few, and both mother and the caretaker stated that she had not had a single in-person visit. Although mother was in inpatient programs for much of this time, there is no discussion of any attempts by DCFS to coordinate visitation between mother and N. The court repeatedly ordered DCFS to assess the feasibility of visits at mother's facilities, but DCFS failed to do so and the court failed to enforce its orders. To the extent mother had visits during this period, DCFS provided no information as to their frequency or quality. As of August 2022, one year after detention, the caregiver reported that mother was having 15 to 20 minute virtual visits once per week. At that time, mother was still entitled to a *minimum* of nine hours of visitation per week with N. There is no record of any attempt by DCFS to provide mother with anything more than the single, short weekly virtual visit allowed by the caretaker. Incredibly, DCFS's failure to provide

reasonable services to mother was then used as a basis to deny her further reunification services.  At the October 2022 hearing, N.'s counsel argued that mother should not get additional services because, among other issues, she had not been visiting with N.  Mother's counsel responded that mother had been attempting to have virtual visits with N. but the caregiver "does not show up." The court then terminated mother's reunification services, finding that mother's visitation had been inconsistent.

"Time [is] critical.  The longer parent and child live with no visitation, the less likely there will ever be any meaningful relationship."  (*Alvin R., supra*, 108 Cal.App.4th at p. 973, citing *In re Monica C., supra,* 31 Cal.App.4th at p. 307.) DCFS's failure to assist mother with any visitation for the first year of N.'s detention, followed by its continuing failure to provide an adequate amount of visitation, was unreasonable.  The court's conclusion to the contrary was not supported by substantial evidence and the order terminating mother's reunification services must be reversed.

## III.    *Relative Placement Preference*

Mother contends that DCFS and the juvenile court failed to apply the relative placement preference under section 361.3 throughout the dependency proceedings, beginning with aunt's request the day after N. was born in August 2021 and culminating in the denial of mother's request to place N. with aunt at the December 1, 2022 hearing. DCFS contends the court correctly found that section 361.3 was not applicable because at the time of the December 2022 hearing, reunification services had been terminated.  Additionally, DCFS argues that any error was harmless because there was ample evidence supporting the juvenile court's determination that retaining N.'s placement with

32

the caregiver was in the child's best interest. We agree with mother that the relative placement preference applied in light of the extensive failures by DCFS and the court and aunt's early and repeated requests for placement. We also conclude that this error was prejudicial and therefore reverse the order denying the request for section 361.3 preference and the order terminating mother's parental rights.

## A.   *Statutory Framework*

The Legislature has unequivocally declared the purpose of dependency law is "to preserve and strengthen a child's family ties whenever possible." (§ 16000, subd. (a).) To that end, the Legislature has instructed that "[i]f a child is removed from the physical custody of his or her parents, preferential consideration shall be given whenever possible to the placement of the child with the relative as required by Section 7950 of the Family Code." (*Ibid*.) As the Legislature has explained, "Research shows that children in out-of-home care placed with relatives and nonrelative extended family members are more stable, more likely to be placed with siblings, and more likely to stay connected to their community and extended family. California statutory and regulatory provisions should maximize the likelihood that a child will initially be placed in the care of a safe relative or nonrelative extended family member who is willing to provide permanent care if reunification cannot be achieved." (§ 16519, subd. (d).)

The statutory framework accordingly sets forth a series of duties and preferences to assist families, DCFS, and the court in considering placement of a detained child. Within 30 days of detention, the social worker must conduct "an investigation in order to identify and locate" all grandparents, parents of a sibling

33

of the child, and other adult relatives of the child, and must provide those relatives with notification of the removal, a relative information form, and their "options to participate in the care and placement of the child and support for the child's family." (§ 309, subd. (e).)  Also upon detention, the social worker must investigate and assess the circumstances and "shall immediately release the child to the custody of the child's parent, guardian, . . . or relative," unless certain enumerated conditions exist, including that "[c]ontinued detention of the child is a matter of immediate and urgent necessity for the protection of the child and there are no reasonable means by which the child can be protected in their home or the home of a relative."  (§ 309, subd. (a).)

If a relative "is available and requests emergency placement of the child pending the detention hearing, or after the detention hearing and pending the dispositional hearing," DCFS "shall initiate an assessment of the relative's . . . suitability for emergency placement pursuant to Section 361.4."  (§ 309, subd. (d)(1).)  Emergency placement requires DCFS to "(1) Conduct an in-home inspection to assess the safety of the home and the ability of the relative . . . to care for the child's needs," and conduct a check of prior child abuse allegations and criminal records for all adults in the home, with certain exceptions. (§ 361.4, subd. (a).)  Upon completion of this assessment, "the child may be placed in the home on an emergency basis."  (§ 309, subd. (d)(2).)  DCFS must then initiate the process for approval of the relative as a resource family "no later than five business days after the placement."  (*Ibid.*)

The relative placement preference is set forth in section 361.3, which states, "In any case in which a child is removed from

34

the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative." (§ 361.3, subd. (a).) "'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "The statute does 'not supply an evidentiary presumption that placement with a relative is in the child's best interests' but it does require the social services agency and juvenile court to determine whether such a placement is appropriate." (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295–1296 (*R.T.*), quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 320.) "The correct application of the relative placement preference places the relative 'at the head of the line when the court is determining which placement is in the child's best interests.'" (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033.)

"[A] timely request for placement, made in open court, is sufficient to trigger the investigation and evaluation required by section 361.3." (*In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1185.) In assessing a relative's request for placement, DCFS and the court must consider the factors enumerated in section 361.3, subdivision (a). These factors include "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs"; the "wishes of the parent, the relative, and child, if appropriate"; the provisions of the Family Code regarding relative placement, including the preference for relative placement under Family Code, section 7950; the "good moral character of the relative and any other adult living in the home"; the "nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to

35

provide legal permanency for, the child if reunification is unsuccessful"; the safety of the relative's home; and the ability of the relative to provide a stable environment for the child, protect the child from his or her parents, facilitation with other relatives, and "provide legal permanence for the child if reunification is unsuccessful." (§ 361.3, subd. (a).)

DCFS must document its efforts to assess relatives for placement in the social study prepared pursuant to section 358.1. (§§ 358.1, subd. (h), 361.3, subd. (c)(2); see also § 16501.1, subd. (d)(1) [DCFS case plan must include reasons for placement decision, which "shall consider, in order of priority, placement with relatives, nonrelative extended family members."].) If the court removes the child from the parents' custody at the disposition hearing, the court "shall make a finding as to whether the social worker has exercised due diligence" in identifying, locating, and notifying the child's relatives. (§ 358, subd. (b)(2).) Similarly, "at any permanency hearing in which the court terminates reunification services . . . the court shall find that the agency . . . has made diligent efforts to locate an appropriate relative and that each relative whose name has been submitted to the agency or entity as a possible caretaker . . . has been evaluated as an appropriate placement resource. (Family Code, § 7950.) "Ideally, the statutory scheme contemplates the Agency has identified and approved the child's relatives for placement before the dispositional hearing. However, '[c]onsistent with the legislative intent for children to be placed immediately with a responsible relative, [section 361.3] does not limit the county social worker's ability to place a child in the home of an appropriate relative or a nonrelative extended family member pending the consideration of other relatives who have requested

36

preferential consideration." (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719 (*Isabella G.*), quoting § 361.3, subd. (b).)

**B.** ***Applicability of Relative Placement Preference***

Despite the family's numerous requests that N. be placed with aunt, the juvenile court first considered mother's request to place N. with aunt pursuant to the section 361.3 relative placement preference on December 1, 2022, one year and three months after N.'s birth. At the time, the court had already terminated mother's family reunification services. The court concluded that section 361.3 did not apply after disposition unless a new placement was necessary, citing *In re M.H.* (2018) 21 Cal.App.5th 1296 (*M.H.*). This was error.

The shifting preferences applicable to a child's placement are subject to some dispute. On one end, it is settled that until disposition, the relative placement preference applies. (§ 361.3, subd. (a); see also *M.H.*, *supra*, 21 Cal.App.5th at p. 1303.) On the other end, after termination of parental rights and selection of a permanent plan of adoption, a caretaker placement preference applies "over all other applications for adoptive placement." (§ 366.26, subd. (k).) In between those points, however, the law is less settled. (See *In re Stephanie M.*, supra, 7 Cal.4th at pp. 319–320 [declining to hold that the relative placement preference does not apply after termination of reunification services].)

Some courts have concluded that the relative placement preference applies after disposition only when "a new placement of the child must be made." (*M.H.*, *supra*, 21 Cal.App.5th at p.

37

1303, quoting § 361.3, subd. (d).)[6]  Other courts have applied the relative placement preference "at least through the reunification period," even where no new placement is necessary.  (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 794; *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 ["the preference afforded by section 361.3 applies to placements made before the juvenile court has terminated reunification services"]; *In re Jessica Z.* (1990) 225 Cal.App.3d 1089, 1098–1099.)

A number of courts have also applied the relative preference to the period between termination of reunification services and termination of parental rights, in circumstances like those present here, where the relative requested placement early in the process and the delay in assessing placement was due to failures by DCFS and the court. In *Isabella G.*, for example, the child's paternal grandparents sought custody immediately after detention.  The agency failed to assess their home and told the grandparents that there was a mandatory one-year waiting period before the child could be moved from the foster family with whom she had been placed.  (*Isabella G., supra*, 246 Cal.App.4th at p. 711.)  The agency ignored another request for placement by grandparents a year later, at which point the parents' reunification services were terminated.  (*Id.* at p. 712.)  After the

_____

[6]     Section 361.3, subdivision (d), states in relevant part: "Subsequent to the [dispositional hearing], whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements."  It is undisputed that here, N. was doing well in her placement with caregiver and therefore, no new placement was required absent application of the relative placement preference.

grandparents filed a section 388 petition, the agency quickly assessed and approved their home. (*Ibid*.) The juvenile court found that section 361.3 did not apply. The appellate court reversed, concluding that the relative preference applied where the grandparents "requested placement prior to the detention, jurisdictional and dispositional hearings," "before the 12-month review hearing," and "after the case was referred for a section 366.26 hearing," and the agency refused to comply with its obligation to conduct a home assessment on any of those occasions, "disregard[ing] the legislative preference for relative placement throughout . . . [the] dependency case." (*Id*. at pp. 722-723; see also *R.T., supra*, 232 Cal.App.4th at p. 1300 [applying relative preference where the relatives invoked the preference before the dispositional hearing, but the agency and court failed to apply it at disposition].)

Here, aunt did everything she could do to seek relative placement. She immediately requested placement of N. and when her initial request to share custody with MGM was rejected due to a possible issue with MGM's background, aunt promptly requested placement on her own and set up a plan to care for N. while she was at work. She maintained contact with DCFS, made herself available for a home assessment, and offered to have maternal uncle move out if his background was an issue.[7] She sought visitation with N. and took advantage of the limited visitation she was given. Moreover, aunt's request for placement, or at least a diligent assessment of possible placement, was echoed repeatedly by mother's counsel and N.'s counsel

---

[7] Despite some references to a possible criminal waiver for maternal uncle, there is no evidence that one was sought or required for aunt's home approval.

39

throughout the proceedings, along with complaints that DCFS was failing to do so.

DCFS did not comply with its duty of due diligence in assessing aunt for possible placement. DCFS has never provided any explanation as to why it did not assess and/or approve aunt for emergency placement prior to resource family approval, why it provided no information to the parties or the court in the first seven months of the case other than to repeat that the approval process was pending (despite multiple orders from the court), or why it did not place N. with aunt immediately upon detaining N. or in March 2022 after she finally received resource approval and DCFS indicated its intent to issue a 14-day notice to the caregiver. It also provided no information to suggest that aunt would not have been appropriate for placement.

The juvenile court compounded these failures—it failed to hold DCFS accountable for its lack of diligence, instead repeatedly issuing orders for DCFS to assess aunt and provide further information in the next report (which DCFS never did). The court also violated its own duty to assess aunt under the relative caregiver preference at the disposition hearing at the latest. (See §§ 361.3, subd. (b), 361.21.) Aunt and mother were not required to move for application of the preference, as they had already repeatedly made clear that aunt wanted to be considered for placement. (See *Isabella G., supra*, 246 Cal.App.4th at p. 722 ["The obligation to assess a relative's home is triggered by the relative's request for placement of the child."], citing § 361.3, subd. (a).) "If an assessment of a relative's home is pending at the time of the dispositional hearing, the juvenile court should proceed with the dispositional hearing and set a hearing under section 361.3 to review the relative placement

40

request as soon as practicable.  (*Id*. at p. 722, fn. 11, citing § 361.3, subd. (b).)  The court did not comply with these statutory requirements.

Under the egregious circumstances presented on this record it would be patently unfair to bar aunt from application of the relative placement preference simply because DCFS and the court delayed the requisite analysis until after mother's reunification services were terminated.  Particularly baffling on this record of DCFS's inexplicable delay is the juvenile court's finding at the eventual section 361.3 hearing that *Isabella G.* was distinguishable because "it wasn't like [DCFS] just delayed, delayed, delayed" in terms of completing the assessment for aunt.  We find *Isabella G.* and similar cases directly applicable and persuasive.  Conversely, we find *M.H.*, on which DCFS and the juvenile court relied, distinguishable.  There, the court found the relative preference inapplicable because the relative, a great-aunt, was not included in the then-applicable definition of "relative" under section 361.3.  (*M.H., supra*, 21 Cal.App.5th at p. 1303.)  Moreover, the great-aunt was not immediately available for placement and there is no indication that the social work agency was dilatory in its duties in seeking to assess the great-aunt, who lived out of state.  (See *id.* at pp. 1299-1302.)  We also agree with the court in *In re Joseph T., supra*, 163 Cal.App.4th at p. 794, which rejected *M.H.*'s narrow reading of the statute that would limit application of the relative preference post-disposition to instances where a new placement was required.  As the court explained, "[n]othing in section 361.3, subdivision (d), states or implies such a result."  (*Ibid*.)  DCFS's contention "that the relative placement preference applies only at the dispositional hearing and whenever 'a new placement is required' thereafter—

41

drastically curtails application of the preference and is therefore antithetical to the Legislature's intent to 'ensure that the greatest feasible effort is made to place dependent children with relatives.'" (*Id.* at p. 797, citing Assem. Com. on Judiciary, Rep. on Sen. Bill No. 270 (1993–1994 Reg. Sess.) as amended June 14, 1993, p. 2.)

We therefore conclude that the juvenile court erred in finding that the relative placement preference did not apply.

### C.  *Prejudicial Error*

We must also determine whether the court's error was prejudicial.  In assessing whether an error is prejudicial, we ask whether there is a reasonable probability of a different result absent that error.  (*In re Celine R.* (2003) 31 Cal.4th 45, 59-60; see also *Isabella G., supra*, 246 Cal.App.4th at pp. 723-724.) DCFS contends that any error in failing to apply the relative placement preference was harmless, as the court also found that it was in N.'s best interests to remain with the caregiver due to their strong bond.  Thus, DCFS contends there is no reasonable probability of a different outcome on remand.  Mother does not dispute the bond between N. and the caregiver or that the caregiver was providing a stable and loving home.  But she argues that the court also should have assessed N.'s relationship with aunt and taken into account the failures of DCFS and the court throughout the proceedings.  We agree with mother and conclude that the court's failure to do so requires reversal.

DCFS's focus remains almost completely on the relationship between N. and the caregiver.  It points to the evidence, almost entirely supplied by the caregiver and letters submitted on her behalf, that she and N. were strongly bonded, that the caregiver provided N. with a loving, stable home and

42

made sure N. had access to the medical care and regional center resources she required, and that N. might suffer "stress, trauma, anxiety, and confusion" if taken away from the caregiver. The juvenile court similarly focused on this relationship, as well as concerns expressed by N.'s pediatrician about moving N.[8] However, DCFS ignores a number of factors that DCFS and the court were required to consider under section 361.3.

In assessing the relative placement preference for aunt, the court was required to conduct not a generalized "best interest inquiry," but an "independent assessment of the relevant statutory criteria under section 361.3" (*Isabella G.*, *supra*, 246 Cal.App.4th at p. 722, fn. 11 citing *R.T.*, *supra*, 232 Cal.App.4th at p. 1300), bearing in mind that "preferential consideration *shall* be given" to a request for relative placement (§ 361.3, subd. (a), emphasis added). Here, a number of the relevant factors weighed in favor of placing N. with aunt, including the strong legislative preference for placement with a family member. In addition, mother, N. (through counsel), and aunt all requested placement with aunt; she had demonstrated her desire to provide a permanent placement for N. through adoption; she visited and bonded with N., along with MGM and N.'s cousin, to the limited degree she was allowed; and she had a demonstrated ability to care for a child with anxiety as she had helped her own daughter

---

[8] There was no objection to the letters submitted by N.'s pediatrician below. We note with some concern the weight that the juvenile court seemed to place on this opinion, without any discussion of its foundation or this doctor's expertise, and no other evidence of N.'s mental state. This is particularly troubling where the caregiver rejected the proposed bonding study, which would have allowed a neutral professional with relevant expertise to weigh in on this issue.

work through those issues, and she showed a willingness to seek treatment for any mental health issues. Indeed, it is telling that despite its unexplained reticence to place N. with aunt, DCFS never identified any concerns about aunt or barriers to that placement. The court was required to weigh these factors against its best interest finding. It does not appear from the record that it did so. There was little evidence in the record regarding aunt's relationship with N.; DCFS provided minimal details and aunt did not testify at the section 361.3 hearing or provide a declaration to counter the evidence supplied by the caregiver.

In addition, the juvenile court's determination that keeping N. with the caregiver was in the child's best interest is undermined by the host of failures by DCFS and the court leading up to it. As we have discussed above, for more than a year the court ordered DCFS to promptly evaluate aunt's home for placement, and DCFS repeatedly failed to comply. Instead of enforcing its prior orders, the court simply repeated them, only to have DCFS again fail to do its duty. As a result, aunt apparently was never considered for placement prior to resource family approval, and she did not receive that approval for more than seven months. At that point, DCFS indicated it was planning to move N. to aunt's care but withdrew that plan due to the caregiver's objection. DCFS provided no other basis for its sudden about-face and the court did nothing to provide aunt with the relative preference assessment to which she was entitled. DCFS continued to defer to the caregiver, allowing her to reject the recommended bonding study out of hand. These failures were compounded by the unreasonably limited visitation given to aunt and N. Despite aunt's requests for additional visitation, echoed by counsel for N. and mother, DCFS allowed the caregiver to

44

unilaterally determine that visits between aunt and N. for two hours once a month were sufficient and to reject weekend visits entirely because the caregiver stated that she was busy using that time to solidify her bond with N. DCFS also failed to provide aunt with unmonitored visits, without giving any reason for doing so and despite all of the evidence indicating that aunt's visits were appropriate.  Once the court ordered DCFS to provide aunt with a written visitation schedule, aunt finally began having unmonitored visits twice per month in October 2022, more than a year after she first requested placement of N.

This series of events–repeated violations of DCFS's duty to follow the law and the court's failure to enforce its own orders—resulted in a complete failure to honor the clear legislative mandate to give early and prompt priority to placement with family members.  As a result, N.'s family was shut out of the process and N. and her family were wrongly deprived of the opportunity provided to them by statute for placement within the family.  This also violated N.'s rights to placement with her close relative and, at a minimum, her right to visit and bond with aunt and aunt's daughter (her first cousin).  (See § 16001.9, subd. (a) [dependent children have the right to "be placed with a relative or nonrelative extended family member if an appropriate and willing individual is available," and to "visit and contact siblings, family members, and relatives privately, unless prohibited by court order"].)  Aunt's, mother's, mother's counsel's, and N.'s counsel's repeated requests for DCFS and the court to perform their statutory duties were ignored, as were their requests for more meaningful visitation.  After enough time passed that N. was bonded to the caregiver, DCFS and the juvenile court then cited that bond as a reason to reject relative placement with aunt.

45

DCFS and the juvenile court cannot completely abdicate their duties in applying the legislative preference of placing detained children with a family member, to the detriment of the child and the family, and then later rely on the passage of time caused by their own failures to preclude that relative from seeking placement of the child as a finding based on the child's best interests. (See, e.g., *In re Mia M.* (2022) 75 Cal.App.5th 792, 811 [finding, in the context of parental notification, that "[a]llowing a child's best interests to act as a counterbalance to the agency's due diligence obligations would turn one of the key goals of the dependency statutory scheme on its head, reducing the chance of family reunification while simultaneously rewarding inadequate efforts" by DCFS].)

We recognize that "[t]he relative placement preference . . . is not a relative placement guarantee." (*In re Joseph T.*, *supra*, 163 Cal.App.4th at p. 798.) In addition, "[t]he passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.) However, mother and aunt are entitled to a full and fair assessment of the relative placement preference and N.'s best interests, following additional reunification services for mother and a meaningful chance at visitation for aunt. It is reasonably likely that such an assessment could lead to a different result upon remand. (See *Isabella G.*, *supra*, 246 Cal.App.4th at p. 725.)

46

Thus, the court's failure to apply the relative placement preference was not harmless.[9]

## DISPOSITION

We reverse the juvenile court orders terminating mother's reunification services and her parental rights and designating the caregiver as N.'s prospective adoptive parent. The matter is remanded for further proceedings, including a hearing on aunt's placement request pursuant to section 361.3 and further ICWA inquiry.

**CERTIFIED FOR PUBLICATION**

COLLINS, ACTING P. J.

We concur:

MORI, J.                                    ZUKIN, J.

---

[9] Mother also challenges the juvenile court's finding that ICWA did not apply, arguing that DCFS failed to conduct the requisite inquiry into possible Native American heritage. She contends that DCFS failed to contact certain maternal relatives identified as possibly having additional information (§ 224.2, subd. (b)) and failed to provide accurate and complete information in the notices sent to tribes (§ 224.3). Because we are remanding on other grounds, we do not reach the merits. Instead, we direct DCFS and the juvenile court to conduct further ICWA inquiry as soon as practicable. If that inquiry reveals evidence of Native American heritage, then DCFS and the court must comply with the additional ICWA requirements, including, if applicable, updated notice consistent with the notice requirements of section 224.3.